UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No: 22-80118-CV-MIDDLEBROOKS/Matthewman

FANE LOZMAN,

    Plaintiff,

v.

CITY OF RIVIERA BEACH,

    Defendant.

_____

**PLAINTIFF'S REPLY IN SUPPORT OF
MOTION FOR PARTIAL SUMMARY JUDGMENT**

## Introduction

The plaintiff's motion for summary judgment made a very simple argument. The undisputed material facts demonstrate two propositions: first, when "Lozman purchased the property, and for many years afterward, there were economically productive uses available to him," the "most obvious" of which was "as a place to live." Mot. 7. But, second, following the city's regulatory and enforcement actions, that is no longer true: today, Lozman "can't build anything on the land, moor anything in the water, put up a fence, get running water or electricity, or receive mail." *Id.* Under the rule of *Lucas v. South Carolina Coastal Council*, when the government denies a landowner "all economically beneficial or productive use of

land," the owner has suffered a taking. 505 U.S. 1003, 1015 (1992). All that remains to be determined, therefore, is the value of what Riviera Beach took.

The city, in its response, makes a few arguments. First, the city claims that there is a dispute about whether it really has forbidden Lozman to use his property in the ways he says they have; second, the city claims that Lozman has been forbidden to use his property in any way since long before he bought it. (The city does not appear to appreciate the ironic tension in these arguments.) The city also argues that Lozman has never before mentioned that he is unable to moor his floating home on his property, which—given the decade-long litigation history between these two parties—just can't be taken seriously. And finally, the city argues that *Lucas* is distinguishable for a handful of reasons, none of which turn out to distinguish the case at all.

None of the city's arguments have any merit, and this court should therefore grant Lozman's motion for summary judgment as to liability and restrict the upcoming trial to the question of damages only.

### A. The Use Restrictions on Lozman's Property Are Undisputed

In the motion for summary judgment, Lozman argued (at 5–6) that, after he purchased his property, the city "revoked, rescinded, or denied all of Lozman's permits (including even a permit to build a fence, which has resulted in his belongings being routinely stolen and vandalized); prohibited him from receiving

electrical service; instructed the United States Postal Service to stop delivering mail to his address; initiated code enforcement proceedings; revoked his homestead designation; enacted a development moratorium in June 2019; and made the moratorium permanent in October 2020, by downzoning his property from RS-5 to 'Special Preservation,' in Ordinance 4147."

Not at all, says the city! When Lozman submitted his request to build a fence, the city says (at 1), it simply refused to do so until he provided "details regarding existing wetlands and mangroves on his property." But notably, the city does not actually say that Lozman *can* build a fence—and the plain text of Ordinance 4147 prohibits it. The only thing that can be constructed in the city's new "special preservation" zone is a small dock for viewing the land (which cannot extend past the "mean low water line"). [DE 12-2] Similarly, the city insists (at 2) that Lozman's electrical service was disallowed because "it was improper to request electrical service for future construction for which permits had not been applied"—but that is the point. Lozman would not have been able to *engage* in any construction under Ordinance 4147. Denying him electrical service until he gets a permit to build something he's not allowed to build *is denying him electrical service*. (The city notably never says anything like "Lozman could get electrical service today. Why, we had no idea he wanted it!")

In a related pair of objections, the city says (at 2–3) that it had nothing to do with the United States Postal Service terminating his ability to get mail or Palm Beach County revoking his homestead exemption. That is incorrect. It is the city's ordinances that forbid Lozman from building anything or residing on his property (see Mot. 5–6) that are the root of the trouble in both cases.

But all of this is, truth to tell, basically immaterial. Even if it were true that Lozman could get mail (for example), or had some dim hope of constructing a fence on his land, the *undisputed* restrictions (like his inability to live there or build anything) would be sufficient for a taking under *Lucas*. *As a matter of law*, all that Ordinance 4147 allows is for Lozman to build a small "viewing" dock. In other words, he is required to leave the land substantially in its natural state. That is *exactly* what *Lucas* held was a taking: "regulations that leave the owner of land without economically beneficial or productive options for its use—typically, as here, by requiring land to be left substantially in its natural state—carry with them a heightened risk that private property is being pressed into some form of public service under the guise of mitigating serious public harm." 505 U.S., at 1018. That is what has happened, and that is why Lozman is entitled to summary judgment on liability.

The city also halfheartedly argues (at 5–6) that Lozman is objecting for "the first time" to his inability to moor a floating home on his property. That is not true.

In his complaint (at ¶4), Lozman alleged that his "intent was to use [the parcel] for his floating home." But, following the city's regulatory actions, Lozman alleged (at ¶28) that his "homestead designation for the Parcel was terminated," and (at ¶33) that the city had "stripped Lozman's Parcel of all economically viable uses."

That is clearly sufficient to preserve the argument that the city has deprived Lozman of the ability to use his parcel as a place to moor a floating home, as part of the taking of his property. In another takings case, *Yee v. Escondido*, the Supreme Court explained that "[o]nce a federal claim is properly presented, a party can make any argument in support of that claim," and gave an example: "Petitioners' arguments that the ordinance constitutes a taking in two different ways, by physical occupation and by regulation, are not separate claims. They are, rather, separate arguments in support of a single claim—that the ordinance effects an unconstitutional taking." 503 U.S. 519, 534–35 (1992). The same analysis applies here: having "properly presented" his "single claim—that the ordinance effects an unconstitutional taking," Lozman "can make any argument in support of that claim," including the argument (clearly identified as early as the complaint) that the city's prohibition on his mooring a floating home is one part of the city's web of regulatory and enforcement actions that took his property.

### B. Lozman's Takings Claim Did Not Ripen Until After He Purchased His Land

The city's most substantial argument (at 3–5) is that its actions since Lozman purchased his property "did not change [his] development rights, as a matter of law." The city claims that under Florida law, its comprehensive land-use plan has *always* forbidden any uses of Lozman's property other than the "conservation" use it can be put to now. Citing *Pinecrest Lakes, Inc. v. Shidel*, 795 So. 2d 191, 198 (Fla. 4th DCA 2001), the city argues (at 4) that it "never had any discretion or flexibility under its comprehensive plan to allow residential on the Property."

First of all, recall: in its motion to dismiss, the city's argument was that Lozman's claim was *not yet ripe*, because he "has not alleged that the City has taken any official action advising him that no development of his property is allowed." Dkt #12, at 9. Back then, the city was arguing that "based on the paucity of allegations regarding any meaningful application to the City for Lozman's intended use of the property, Lozman has failed to allege a ripe claim for either the single-family residence development he subjectively believed he could pursue or for the 'floating home' use he alleges he actually intended to pursue, and his Complaint should be dismissed." *Id.*, at 16.

The city argued, in other words, that Lozman had not yet suffered a final determination of his right to develop his land. Now, the city argues something entirely opposite: that Lozman could *never* get permission to develop his land. The

basic rule of judicial estoppel prohibits parties "from deliberately changing positions according to the exigencies of the moment." *Slater v. US Steel Corp.*, 871 F.3d 1174, 1180 (11th Cir. 2017). *See also* 18 James Wm. Moore et al., MOORE'S FEDERAL PRACTICE ¶ 131.13[6] (3d ed. 2015) (explaining that doctrine of judicial estoppel is concerned with "the orderly administration of justice and regard for the dignity of court proceedings"). The city's inconsistency is enough to dismiss its argument here—but there is more.

The city's argument is basically that as a *matter of Florida law*, Riviera Beach was required to abide by its comprehensive land-use plan. But that is not the question. As explained in the motion for summary judgment (at 9–10), as a matter of *federal takings law*, Lozman's takings claim did not ripen until the city's general comprehensive plan was reduced to something more concrete—like an enforcement action or a zoning ordinance. Before anything is "taken" for Fifth Amendment purposes, a plaintiff must demonstrate that such a plan "has been *applied* to his property." *South Grande View Development Co. v. City of Alabaster*, 1 F.4th 1299, 1306 (quoting *Eide v. Sarasota County*, 908 F.2d 716 (11th Cir. 1990)). In *Eide*, the Eleventh Circuit rejected a takings claim based solely on a "comprehensive plan to map out the future development of land in the County," on the grounds that it was unripe; in *South Grande View*, the court held that when such a plan is reduced to a specific zoning ordinance or enforcement decision, such a claim *is* ripe.

Therefore, Lozman could not challenge the city's actions until recently. And what is more, Riviera Beach *knows* this, because Riviera Beach was instrumental in making it so. Actually, what the city is attempting is actually quite absurd. Recall: When Riviera Beach adopted its original comprehensive plan, which proposed restricting future development for "preservation" reasons, it was sued by landowners who alleged a taking. *City of Riviera Beach v. Shillingburg*, 659 So.2d 1174 (Fla. 4th DCA 1995); *Taylor v. City of Riviera Beach*, 901 So.2d 259, 263 (Fla. 4th DCA 2001). In response, the city *insisted* that such claims were not yet ripe, and earnestly assured Florida state courts that its plan was flexible enough to avoid takings liability. *And the Florida courts went for it*. Then, *after* Fane Lozman bought the property at issue, the city slammed the door shut—reducing its flexible comprehensive plan to a black-and-white ordinance forbidding anything other than a fishing dock and taking enforcement actions against him. In response, he sued; but *now*, the city is claiming that the appropriate time to challenge that total restriction *was back when the Plan was passed*. Which of course, is what people tried to do—until the city stopped them by asserting their claims weren't ripe.

What Riviera Beach is trying to do is split its taking into two steps—first, it passes the comprehensive plan, and insists that it can't be sued over it; then, it codifies that plan in its zoning code, and insists that the time for a lawsuit was long ago. The whole thing has the feel of being a guest in someone's home, knocking

over a lamp, and—upon being asked to replace it—replying, "what? That lamp's not worth anything; it's broken!" It's a clever idea; it's a kind of Three-Card Monte with Florida landowners.

And imagine if it works. Then, Riviera Beach gets to forbid all development in the "special preservation" zone, *without ever having to pay anyone a dime*. Think about that. Vast tracts of extremely valuable land (remember, if Lozman could build homes on this land, it would be worth nearly $50 million) will be converted by Riviera Beach into public nature preserves, and the affected landowners will never get anything. *Nothing.* That is so fundamental a violation of the basic principles of the Takings Clause, as articulated in *Lucas*, that it just *cannot* be right. A restriction on development this severe requires compensation to the affected land owners at some point; the city insisted that the time to do so was not when the comprehensive plan was passed; and so that means that the time is now.

### C. This Case is *Lucas* in Every Way That Matters

Last, the city argues that the facts of *Lucas* are "distinguishable" from this case, and proposes several ways in which the events of this case are in a literal sense different from *Lucas*. But none of those differences *make* a difference; they are akin to pointing out that the cases are different because that case involved South Carolina, and this one doesn't.

First, the city says, the purchase price of the land in *Lucas* was higher. So what? That question goes to a "reasonable investment-backed expectations," *Penn Central*-type theory of takings—which is not what Lozman has pursued. And the city points to nowhere—*nowhere*—in Justice Scalia's opinion for the Court in *Lucas* that made the purchase price relevant to the question of *liability*. That is because no such section exists. The closest the city gets is a vague gesture toward a Ninth Circuit opinion discussing a Supreme Court opinion discussing *Lucas*: beware, the city says, of the "equitable distinction between someone who takes title prior to the regulation and someone whose post-regulation purchase price already accounts for the challenged development restriction."

The city does not mention, however, that the Supreme Court case it cites—*Palazzolo v. Rhode Island*, 533 U.S. 606 (2001)—says that a landowner *can* bring suit to challenge a development restriction that was in place at the time he bought the property. "Were we to accept the State's rule, the postenactment transfer of title would absolve the State of its obligation to defend any action restricting land use, no matter how extreme or unreasonable. A State would be allowed, in effect, to put an expiration date on the Takings Clause. This ought not to be the rule. Future generations, too, have a right to challenge unreasonable limitations on the use and value of land." *Id.* at 627.

The city also says (at 7) that the "post-regulatory values" are different in this case and *Lucas*—but that question goes to damages, not liability, and as this summary judgment motion is restricted to the question of liability only, we will say no more about that question at this point. The same can be said of the contention (at 8) that Lozman's property has risen in value since its purchase—that is really an argument about damages. The question of liability turns on whether there was an economically productive use for Lozman's land before (there was; he lived on it) and whether there is one now (there isn't; the city essentially admits this, with one exception about to be discussed).

Finally, the City argues (at 8–9) that there has not been a taking under *Lucas* because Lozman's property retains residual economic value when used for conservation and mitigation. In fact, the City says, their expert thinks Lozman's property (when used for that purpose) is worth more today than it was when he bought it. The city thinks this distinguishes the case from *Lucas*; it surely does not.

The core of the City's argument (at 8) is the determination of its expert property appraiser that Lozman's property retains the "economically beneficial use" of "passive recreation, conservation, or mitigation." Tellingly, the City does not point to a single instance where any federal court has ever regarded the existence of those uses as sufficient to defeat a *Lucas* takings claim. That is because it would be inconsistent with the facts of *Lucas* itself. The Court concluded there that the

government's actions had denied "all economically beneficial or productive use of land," and thus that the land has been taken. 505 U.S., at 1016. Regulations "that leave the owner of land without economically beneficial or productive options for its use," such as "by requiring land to be left substantially in its natural state"—sound familiar?—pose a "heightened risk that private property is being pressed into some form of public service under the guise of mitigating serious public harm." *Lucas*, 505 U.S., at 1018.

In *every* regulatory takings case, therefore, it will be possible for the government to point to the residual "use" of "passive recreation, conservation, or mitigation." The entire point of the *Lucas* doctrine is that such uses do not count as the sort of economically beneficial use sufficient to defeat liability. If it were otherwise, *Lucas* would be a dead letter—in what case will it not be true that a government regulatory decision permits the continued "use" of land for conservation?

The facts of *Lucas* are, in every material respect, identical to Lozman's. *Lucas* purchased a parcel of land on the beachfront—same here. *Id.*, at 1008. At the time he did, it was permissible to use it for, and develop, single-family housing—same here. *Id.* A few years later, the state (for conservation reasons) designated the land as part of a "critical area" in which the construction of any building in which a person could live was "flatly prohibited"—same here. *Id.*, at 1008–09. This construction

ban rendered Lucas' land "valueless"—same here. *Id.*, at 1020. But, the Supreme Court said, any "limitation so severe" cannot be "legislated or decreed" unless the government pays compensation. *Id.*, at 1029.

Same here.

## Conclusion

The motion for partial summary judgment should be granted, and the trial in this case should be restricted to the question of damages.

Dated: January 6, 2023                    Respectfully submitted.

                                          Attorneys for Plaintiff


/s/Ian Samuel
STE. MONIQUE APPELLORS, LLC
2200 Colorado Avenue, Suite 512
Santa Monica, CA 90404
Telephone: (917) 803-8609
Primary Email: ian@stemonigue.com
Attorney for Plaintiff

/s/ Benjamin L. Reiss
Benjamin L. Reiss, Esq. (FBN 985643)
breiss@pbyalaw.com
Oliver M. Birman (FBN 123750)
obirman@pbyalaw.com
PERLMAN, BAJANDAS,
YEVOLI &ALBRIGHT, P.L.
283 Catalonia Avenue, Suite 200
Coral Gables, FL 33134
Tel: (305) 377-0086 / Fax: (305) 377-0781

/s/Kerri L. Barsh
GREENBERG TRAURIG, LLP
333 SE 2nd Avenue, Suite 4400
Miami, FL 33131
Telephone: (305) 579-0772
Primary Email: barshk@gtlaw.com


/s/Jonathan O'Boyle
THE O'BOYLE LAW FIRM
Attorneys for Plaintiff
1286 West Newport Center Drive
Deerfield Beach, FL 33442
Telephone: (754) 212-4201
joboyle@oboylelawfirm.com


/s/Edward A. Weinhaus
STE. MONIQUE APPELLORS, LLC
10859 Picadily Square Drive
Creve Coeur, MO 63146
Telephone: (314) 580-9580
Primary Email: coach@appellors.com


PHILIP J. NATHANSON
Trial & Appellate Attorney
7450 E. PINNACLE PEAK RD. #150
Scottsdale, AZ 85255
Phone:480-235-0978
www.trialandappellatelaw.com

## **Certificate of Service**

  I HEREBY CERTIFY that on January 6, 2023, I electronically filed the foregoing document with the Clerk of Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record., either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

               */s/ Benjamin L. Reiss*
               Benjamin L. Reiss (985643)