**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

CASE NO. 22-80118-CV-MIDDLEBROOKS

FANE LOZMAN,

    Plaintiff,

    vs.

CITY OF RIVIERA BEACH, FLORIDA,

    Defendant.

_____/

**<u>ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT</u>**

THIS CAUSE comes before the Court upon Plaintiff's Motion for Partial Summary Judgment (DE 137) filed December 21, 2022, and Defendant's Motion for Summary Judgment (DE 135) filed December 19, 2022.  Plaintiff Fane Lozman and Defendant City of Riviera Beach, a municipality in Palm Beach County (Complaint at ¶5), have had a tempestuous relationship and legal history, which has led to two decisions in Plaintiff's favor in the Supreme Court.  See *Lozman v. City of Riviera Beach*, 568 U.S. 115(2013) ("Lozman SC I"); *Lozman v. City of Riviera Beach*, 138 S. Ct. 1945 (2018) ("Lozman SC II").

One case involved the seizure and destruction of Mr. Lozman's floating home.  The other involved an arrest of Mr. Lozman while he was speaking at a City Council meeting.  This case is another chapter in this dispute. It presents issues involving the just compensation clause of the Fifth Amendment and federal and state law concerning submerged lands beneath navigable and tidal waters.

Plaintiff brings his Complaint filed on January 24, 2022 (DE 1) ("Complaint") pursuant to 42 U.S.C. § 1983, arguing that the City has taken his private property (the "Property") without just

1

compensation. (Complaint at 7).  Plaintiff filed for Partial Summary Judgment on the question of liability (DE 137) and Defendant has also moved for Summary Judgment (DE 135). Both the motions are fully briefed (DE 137, 158, 168, 135, 143, and 151) and oral argument took place on February 9, 2023. (DE 192).  For the reasons that follow, Plaintiff's Motion is denied and Defendant's Motion is granted.

I.      **BACKGROUND**

   A.  **Mr. Lozman's Property**

   Mr. Lozman owns real property located at 5101 N. Ocean Avenue, Riviera Beach, Florida. Almost all of his property is submerged land within the Lake Worth Lagoon. The Lagoon is Palm Beach County's largest estuary, spanning approximately twenty-one miles from North Palm Beach to Ocean Ridge.  Lake Worth Lagoon is up to a mile wide and connected to the Atlantic Ocean via two inlets.  The Atlantic Intracoastal Waterway cuts through the estuary as it traverses the East Coast of the United States.  Lake Worth Lagoon is subject to the ebb and flow of the tide and is also used to transport interstate commerce.

   Only a sliver of Mr. Lozman's land is above water. The dry land is approximately 20 feet wide, along N. Ocean Drive, its eastern boundary.  The dry portion of his land has vegetation sea grapes and mangroves. From north to south the property is approximately 300 feet. (Appendix A; *see also* DE 134-20).  While the western boundary line is disputed, this portion is approximately 7.75 acres.  Only approximately .2 acres is dry land.

   Mr. Lozman acquired the property from Ms. Omah Kiser in 2014.  Mr. Lozman testified that Ms. Kiser got in touch with him after hearing about the destruction of his floating home. According to Mr. Lozman, she had obtained the property from her father and "she thought it would be a good property where I could put a floating home on and the City could never take it and

2

destroy it again…" (DE 134-3 at 13).  Ms. Kiser told Mr. Lozman she wanted to give him the property because she did not plan to develop it. (DE 138-1 at 5).  But Mr. Lozman purchased the property for $24,000.00. *Id*.

In the early summer of 2016, Mr. Lozman brought a floating home to the property and lived there for a time. (DE 134-3 at 21). But the home was vandalized and then sunk. (*Id*. at 21-23).

Subsequently, in 2019 or 2020, Mr. Lozman placed a more substantial floating home on the property. (*Id*. at 27). That home was secured by concrete blocks.  *Id*. at 25-26. On December 1, 2020, the State of Florida Department of Environmental Protection issued a Notice of Violation, Orders for Corrective Action and Administrative Penalty with findings of fact and conclusions of law that determined that the concrete blocks constituted unauthorized filling of surface waters on the property within the Lagoon. (DE 134-26 (*State of Florida Department of Environmental Protection v. Lozman*, No. 2021-CA-004564, DE 40 at 1-2 (Fla. 15th Cir. Ct., Aug. 2021)) ("FDEP v. Lozman Final Consent Judgment").  On August 16, 2021, the Florida State Court ordered removal of the structures. *Id*. at 2. On or about September 7, 2021, the structures were removed. *Id*.

On June 30, 2022, a consent judgment was entered ordering that Mr. Lozman not fill or deposit any material within the property until: "i. A final judgment . . . or subsequent action for declaratory relief is issued" in Mr. Lozman's favor authorizing fill on the property or; ii. "A valid final permit is issued by the Department authorizing fill on the Property or, iii. A written order verifying an exemption is issued by the Department" (*See* DE 134-26 at 3).

Around the same time, on June 25, 2021, at the request of the Secretary of the Army acting through the United States Army Corps of Engineers, the United States sued Mr. Lozman. *See*

*United States v. Lozman*,  No. 21-cv-81119 (S.D.F.L.) ("*U.S. v. Lozman* 21-81119". The complaint alleges that Mr. Lozman is building structures in waters of the United States without authorization, in violation of the Rivers and Harbors Appropriation Act of 1899, 33 U.S.C. § 406, 413, and that Mr. Lozman is creating an obstruction to navigable waters, in violation of 33 U.S.C. § 403. (*Id*. at DE 1). That case has been stayed while Mr. Lozman seeks a permit from the U.S. Army Corps of Engineers. (*Id.* at DE 55).

On March 29, 2021, Mr. Lozman sued the State of Florida Department of Environmental Protection and the Board of Trustees of the Internal Improvement Trust Fund ("TIITF") of the State of Florida alleging that as a successor to a TIITF deed, he had a right to bulkhead and fill without need of a permit from FDEP. (DE 134-22).  The defendants moved to dismiss and on December 9, 2021, the state trial judge granted that motion. (DE 134-24).  The dismissal order advised Mr. Lozman that "he could elect to pursue administrative remedies through the DEP, appeal, or seek leave to amend." *Id*.  He pursued none of these alternatives. Instead, on April 4, 2022, Mr. Lozman filed a stipulation of dismissal. (DE 134-25 at 3).

Rather than continuing to pursue his remedies in state court, Mr. Lozman filed this action. He alleges that the City of Riviera Beach has taken his property and he should recover damages including "the fair market value for the land based on the highest and best use supported by reasonable expectations on the date of the taking…" (DE 1).

Mr. Lozman has produced an appraisal which states that "the highest and best use would be to bulkhead and fill to create a site with up to eight one-acre parcels." (DE 134-17 at 28). Mr. Lozman's report values the property as of October 7, 2020 to be $49,833,500. (DE 134-17 at 46).

**B.  The Comprehensive Plan and Regulatory Framework**

In Florida, "each county and municipality is required to prepare a comprehensive plan for

approval by the Department of Community Affairs." *Bd. of County Comm Rs v. Snyder*, 627 So. 2d 469, 473 (Fla. 1993). The adopted local plan must include "'principles, guidelines and standards for the orderly and balanced future economic, social, physical, environmental, and fiscal development' of the local government's jurisdictional area." *Id*. (citing to § 163.3177(1) Fla. Stat. (1991)).

The Comprehensive Plan is both paramount and nondiscretionary. *See* § 163.3194(1)(a), Fla. Stat. (2022) ("After a comprehensive plan…has been adopted in conformity with this act, *all development* undertaken by, and all actions taken in regard to development orders by, governmental agencies in regard to land covered by such plan or element *shall be consistent with such plan* or element as adopted.") (emphasis added).

"The statute is framed as a rule, a command to cities and counties that they must comply with their own Comprehensive Plans after they have been approved by the State." *Pinecrest Lakes, Inc. v. Shidel,* 795 So. 2d 191, 198 (4th DCA 2001). The statute does not say that local governments retain any degree of discretion as to whether a proposed development should be consistent with a Comprehensive Plan. *Id*.

"[C]itizen enforcement is a primary tool for insuring consistency of development decisions with the Comprehensive Plan," and Florida courts do not accord deference to the local government's interpretation. *Id*. at 202. For example, in *Pinecrest Lakes*, upon a finding of development inconsistent with a Comprehensive Plan, a trial judge ordered the demolition of apartment buildings at a loss of $3.3 million dollars, and the appellate court affirmed. *Id*.

Riviera Beach has adopted a Comprehensive Plan ("the Plan"). (DE 134-7). The history of the Plan's adoption is described in *City of Riviera Beach v. Shillingburg*, 659 So. 2d 1174 (Fla. 4th DCA 1995).

The State of Florida's Department of Community Affairs ("DCA") has the duty to determine whether Comprehensive Plans are "in compliance." *Florida League of Cities, Inc. v. Admin. Com'n*, 586 So. 2d 397, 400 (Fla. 1st DCA 1991). A "not in compliance" finding could jeopardize state funding for the City. *Id*. DCA determined that the City's initial Plan was "not in compliance," in part because it allowed residential development of the submerged land along the east side of the Lake Worth Lagoon. (DE 134-8); *Shillingburg*, 659 So 2d at 1177. DCA required the City "to revise the plan 'to establish a lower density for areas designated as preservation….'" *Id*.

The City and the DCA entered a stipulated settlement agreement which, in part, created the Special Preservation ("SP") Future Land Use ("FLU") designation for the area:

> Special Preservation –mangroves, wetlands, and special estuarine bottom lands. These mangroves and special estuarine bottom lands are protected by federal, State and local agencies involved in the wetlands preservation, dredge and fill permitting, and other hydrological modifications. It is the expressed policy objective of the City to preclude any development of submerged lands, including but not limited to mangroves, wetlands, and estuarine bottom lands, to the maximum extent permissible by law. It is further the policy of the City to oppose any applications for dredge or fill permits pending before applicable State or Federal agencies. This policy objective shall not be construed, nor implemented to impair or preclude judicially determined vested rights to develop or alter submerged lands.

(DE 134-8 at 21). The SP FLU was approved by DCA and became effective on December 19, 1991. *Shillingburg*, 659 So. 2d at 1177.

Litigation regarding the SP FLU designation ensued, during which the City amended the Plan to allow "private residential fishing or viewing platforms and docks for nonmotorized boats." *Id*. at 1178. Nevertheless, the plaintiffs/landowners claimed facial and as-applied takings. *Id*. The Fourth District Court of Appeal held that the SP FLU provision did not constitute a facial taking,

because it allowed a dock and left open the possibility of other uses. *Id*. at 1179.  The Court held

the as-applied challenges were not ripe. *Id*. at 1180.

In August 1993, the City submitted proposed Plan Amendment 93-11 to the DCA for

review and comments.  *Taylor v. City of Riviera Beach*, 801 So. 2d 259, 260-61 (Fla. 4th DCA

2001).  This amendment proposed low-density residential development in the SP FLU.  *Id.* DCA

objected, and the City abandoned this amendment. *Id.* On May 17, 1995, the City asked DCA

whether it would allow any development on the submerged lands and, if so, of what type and

density. *Id*.; (DE 134-10 (May 17, 1995 D. Kant Letter) at 2).  On August 10, 1995, DCA

responded that "in the absence of a judicial determination of a vested right to develop, no

development of submerged lands should be allowed." *Taylor*, 801 So. 2d at 260-61; (DE 134-11).

The Plan was amended on October 6, 2010, preserving the SP FLU language required by

DCA and providing that

> private residential fishing or viewing platforms and docks for non-
> motorized boats may be permitted subject to the following
> regulations:
> 1.       Platforms and docks shall not extend outward past the mean
> low water line.
> 2.       Construction must be fully achievable from an on-shore
> location.
> 3.       Permits must be obtained from DEP and/or all other
> applicable regulatory agencies.

(DE 134-12). The 2010 Plan further provides, "[t]he policy objective shall not be construed nor

implemented to impair or preclude judicially determined vested rights to develop or alter

submerged lands," consistent with the DCA's 1995 correspondence. *Id.*

On December 1, 2021, the City updated the Plan to include the following language as

part of the SP FLU: "For properties found to have judicially determined vested rights to

develop or alter submerged lands, a density of one unit per 20 acres will be assigned to said

property." (DE 134-13).  Thus, properties with a vested right to fill submerged lands may develop at one residential unit per 20 acres without a plan amendment.

Mr. Lozman's property has been assigned an SP FLU since 1991. (DE 134-14 at ¶4) ("Sirmons Affidavit").  However, at the time of purchase, the property bore an inconsistent residential zoning designation, RS-5. (Complaint at ¶12).

On July 8, 2020, the City adopted Ordinance 4147 to create a SP zoning district matching the existing SP FLU designation for properties assigned to the SP FLU. (DE 134-15 at 5) ("Ordinance 4147")).  The SP zoning district is virtually identical to the SP FLU policy, including the same "savings clause." *Id*. at 2-3, §2.  Ordinance 4147 allows the same "private residential fishing or viewing platforms and docks for non-motorized boats" as well as mitigation banks and preservation land. *Id*.

On October 20, 2021, Riviera Beach adopted Ordinance No. 4178 pertaining to "boats, vessels, floating structures, live-aboard vessels" and other watercraft. (DE 144-8).[1]  The Ordinance is expressly responsive to the Supreme Court's holding in Lozman SC I and prohibits floating structures and live-aboard vessels within the City with certain exceptions. Pertinent here, Ordinance 4178 does not apply to floating structures and/or live-aboard vessels lawfully moored in a permitted private mooring field, provided the structure or vessel is not moored in less than four feet of water measured at mean-low tide.  Moreover, Ordinance 4178 is not applicable to a floating structure that federal, state and local laws and regulations expressly permit and has received all required permits or to any vessel, including a live-aboard

---

[1] Mr. Lozman does not allege that Ordinance No. 4178 constituted a taking of his property. However, in his response to the City's summary judgment motion, he suggests that the houseboat ordinance was also a taking. (DE 143 at 2).

vessel located upon the Florida Intracoastal Waterway.

## II.    SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Whether a taking compensable under the Fifth Amendment has occurred is a question of law based on factual underpinnings." *Bass Enterprises Prod. Co. v. United States*, 133 F.3d 893, 895 (Fed. Cir. 1998) (citing *Penn Central* and *Lucas*). In my view, the conclusions I have reached in this Order turn on legal questions, based upon facts that are not in dispute.

## III.    ANALYSIS

To advance his claim, Mr. Lozman relies upon two cases, the Supreme Court's decision in *Lucas v. S.C. Coastal Council*, 505 U.S. 1003(1992) and the Eleventh Circuit's recent decision in *South Grande View Development Co. v. City of Alabaster*, 1 F. 4th 1299 (11th Cir. 2021).  The facts of those cases, however, are strikingly different than those presented by Mr. Lozman. Neither is helpful, and their analyses show the deficiencies of Mr. Lozman's claim.

First *Lucas*:  Mr. Lucas bought two residential lots, approximately 300 feet from the beach on the Isle of Palms in South Carolina for $975,000. *Lucas* at 1006. At the time he acquired the parcel there was no obligation to obtain any permits and his intention was to do what the owners of the immediately adjacent parcels had already done; erect single family residences. *Id*. at 1008. He commissioned architectural drawings. *Id*.

Two years later the South Carolina legislature enacted the Beachfront Management Act. *Id*.  The Act decreed a permanent ban on construction as far as Mr. Lucas' lot were

concerned and the lower courts found that this prohibition deprived him of any reasonable economic use of the lots. *Id*. at 1009.

The Supreme Court held "that when the owner of real property has been called upon to sacrifice *all* economically beneficial uses in the name of the common good, that is, to leave his property economically idle, he has suffered a taking."  *Id*. at 1019.

However, the court emphasized "that the Takings Clause does not require compensation when an owner is barred from putting land to a use" proscribed by existing rules or understandings. *Id*. at 1030.  *Lucas* requires a "logically antecedent inquiry" into the background principles of property law as that determines the nature of the private property allegedly taken.[2] *Id*. at 1027. And, particularly given the facts in this case, it is useful to look at the examples the Court gave. *Compare Scranton v. Wheeler*, 179 U.S. 141(1900) (interests of "riparian owner in the submerged lands…bordering on a public navigable water" held subject to Government's navigational servitude), with *Kaiser Aetna v. United States*, 444 U.S. at 178-180 ("imposition of navigational servitude" on marina created and rendered navigable at private expense held to constitute a taking).  "On this analysis, the owner of a lakebed . . . would not be entitled to compensation when he is denied the requisite permit to engage in a landfilling operation that would have the effect of flooding others' land." *Lucas* at 1029.

Interests in property are not created by the Constitution. *Webbs Fabulous Pharms. v. Beckwith*, 449 U.S. 155, 161 (1980). Rather they are created and defined "by existing rules or understandings that stem from an independent source such as state law." *Id*. at 451. Over thirty

---

[2] *Lucas*, 505 U.S. at 1003, 1027 ("Where the State seeks to sustain regulation which deprives land of all economically beneficial use, we think it may resist compensation only if the logically antecedent inquiry into the nature of the owner's estate shows that the prescribed use interest were not part of his title to begin with.")

years before Mr. Lozman acquired his property, the Florida Supreme Court, in analysis that anticipated the Supreme Court's *Lucas* decision, held that a limitation on filling submerged lands did not constitute a taking. *See Graham v. Estuary Props Inc.,* 399 So. 2d 1374 (Fla. 1981) *cert. denied* 454 U.S. 1083 (1981).  There, the plaintiff owned almost 6,500 acres in Southwest Florida, much of it wetlands and submerged lands. *Id.*  at 1376. Only about 526 acres were "dry enough to be classified as non-wetlands."  *Id.*  The plaintiff sought to dredge and fill a substantial portion of the wetlands. *Id.*  The Board of County Commissioners and the Florida Land and Water Commission denied the application, but the First District Court of Appeals held that the denial constituted a public taking of private property for public use without compensation in violation of both the United States and Florida Constitutions. *Id.*

The Florida Supreme Court reversed and in doing so, made three points pertinent here. First, the Court distinguished cases where the landowners had purchased submerged lands directly from the state with express authorization to fill the land.

> The property owned by Estuary, on the other hand is not entirely submerged although part of it is covered part of the time by tidal flows.  Furthermore, Estuary did not purchase the property from the state. Estuary purchased the property in question from a private individual with full knowledge that part of it was totally unsuitable for development.

*Id.* at 1381. The Florida Court quoted with approval language of the Wisconsin Supreme Court: "an owner of land has no absolute and unlimited right to change the essential natural character of his land so as to use it for a purpose for which it is unsuited in its natural state and which injures the rights of others." *Just v. Marinette County*, 56 Wis 2d. 7, 17, 201 N.W. 2d 761, 768 (Wis. 1972); *see also*, *Namon v. State Dept of Environmental Regulation,* 558 So. 2d 504 (Fla. 3d DCA 1990) (citing *Graham v. Estuary Properties, Inc., supra*, and finding no taking where 6-acre tract could not be developed without filling wetlands. "Appellants are

deemed to purchase the property with constructive knowledge of applicable land use regulations.").[3]

## A. Background Principles

Most of Mr. Lozman's property is and always has been submerged land in an environmentally sensitive protected lagoon. His property interests have always been limited by background principles of both federal and state law. He could have no reasonable expectation to be able to change the essential natural character of his property.

### 1. Navigation Servitude

The United States contends that the Lake Worth Lagoon beneath which Mr. Lozman's submerged lands exist are navigable waters of the United States within the meaning of section 10 of the Rivers and Harbors Act, 33 U.S.C § 403 which provides:

> The creation of any obstruction not affirmatively authorized by Congress, to the navigable capacity of any of the waters of the United States is prohibited; and it shall not be lawful to build or commence the building of any wharf, pier, dolphin, boom, weir, breakwater, bulkhead, jetty, or other structures in any port, roadstead, haven, harbor, canal, navigable river, or other water of the United States, outside established harbor lines, or where no harbor lines have been established, except on plans recommended by the Chief of Engineers and authorized by the Secretary of the Army; and it shall not be lawful to excavate or fill, or in any manner to alter or modify the course, location, or capacity of, any port, road stead, haven, harbor, canal, lake, harbor of refuge, or enclosure within the limits of any breakwater, or of the channel of any navigable water of the United States, unless the work has been recommended by the Chief of Engineers and authorized by the Secretary of the Army prior to beginning the same.

---

[3] *See also*, *Murr v. Wisconsin*, 137 S. Ct. 1933, 1945-46 (2017) ("courts must look to the physical characteristics of the landowners' property. These include the physical relationship of any of the distinguishable tracts, the parcel's topography, and the surrounding human and ecological environment. In particular it may be relevant that the property is located in an area that is subject to, or likely to become subject to environmental or other regulation.")

"Navigable waters of the United States" include "those waters that are <u>subject to the ebb and flow of the tide</u>." 33 C.F.R. 5329.4; *United States v. Harrell*, 926 F. 2d 1036, 1039 (11th Cir. 1991) (emphasis added). As noted above, the United States has initiated enforcement proceedings against Mr. Lozman as a result of the presence of his floating home. *U.S. v. Lozman* 21-81119.  That case has been stayed while Mr. Lozman seeks a permit.

Navigable waters are subject to national planning and control; "there is no private property in the flow of the stream." *United States v. Appalachian Power Co.,* 311 U.S. 377, 423 (1940).  Moreover,

> [w]hatever the [n]ature of the interest of a riparian owner in the submerged lands in front of his upland bordering on a public navigable river, his title is not as full and complete as his title to fast land which has no direct connection with the navigation of such water.  It is a qualified title, a bare technical title, not at his absolute disposal, as is his upland, but to be held at all times subordinate to such use of the submerged lands and the waters flowing over them as may be consistent with or demanded by the public right of navigation.

*Scranton v. Wheeler*, 179 U.S. 141, 163 (1900); *see also*, *Kaiser Aetna v. United States*, 444 U.S. 164 (citing to *United States v. Chandler-Dunbar Water Power Co.*, 229 U.S. 53 (1913).

Similarly, the State of Florida Department of Environmental Protection has instituted enforcement proceedings against Mr. Lozman and found that concrete blocks placed in the lagoon to moor the floating home constituted unauthorized filling of surface waters. (DE 134-26). Subsequently, the Department filed a petition in state court to enforce the provisions of its final order.  The Department alleged that by filling the Lake Worth Lagoon with structures, Mr. Lozman violated Section 373, 129(i) and 403,161, Florida Statutes and that his actions threatened navigation, sensitive and federally protected seagrass and the habitat for marine life including sea turtles and manatees. On August 16, 202, the State Circuit Court granted the

Department's Motion for Temporary Injunction requiring Mr. Lozman to remove any structures on the property and prohibited placement, deposit, or storage of any additional structures or fill on the property until further written Order of the Court. *Id*. at 2. On June 6, 2022, Mr. Lozman and the Department agreed to entry of a consent judgment where Mr. Lozman agreed not to fill or deposit any material by any means on or within the property "unless a valid permit is issued by the Department authorizing fill on the property, a written order verifying an exemption is issued; or a court order in a subsequent action for declaratory relief is issued authorizing fill on the property." (DE 134-26).

### 2. *Public Trust Doctrine*

When Florida was admitted into the union in 1845, it became the owner of all lands beneath navigable waters. *See Coastal Petroleum Co. v. American Cyaramid Co*., 492 So. 2d 339, 342 (Fla. 1986). The state government holds the lands "in trust for the whole people within" the state. *State ex rel. Ellis v. Gerbing*, 56 Fla. 603, 47 So. 353, 355 (1908); *see also*, Article X § 11, Florida Constitution; *Brickell v. Trammel*, 74 Fla 544, 82 So. 221 (1919).

Under the public trust doctrine, the ability of the state to alienate the land is limited; "not for the purposes of sale or conversion into other values, or reduction into several or individual ownership, but for the use and enjoyment of the same by all of the people of the [s]tate for, at least, the purposes of navigation and fishing, and other implied purposes…" *State v. Black River Phosphate Co.*, 32 Fla. 82, 13 So 640, 648 (1893).

Mr. Lozman's land is a portion of approximately 311 acres conveyed to the Lake Worth Realty Company by the Board of Trustees of the Internal Improvement Trust Fund of the State of Florida in 1924. (DE 134-6).

The deed purports to be issued pursuant to Chapter 7304, Laws of Florida. *Id*. Enacted

14

in 1917, it provided that "[t]he title to all . . . islands, sand bars, shallow banks or small islands made by the process of dredging of the channel by the United States Government located in the tidal waters of the counties in the State of Florida, or similar, or other islands, sand bars and shallow banks upon which the water is not more than three feet deep at high tide and which are separated from the shore by a channel or channels, not less than five feet deep at high tide, or sand bars and shallow banks along the shores of the mainland in which the title is not, at this date, invested in prior parties, is hereby invested in the Trustees of the Internal Improvement Fund of the State of Florida to be held by the State of Florida and disposed as hereinafter provided.'" *Deering v. Martin*, 95 Fla. 224, 229, 116 So. 54 (1928). Section Two of the Act provided that the Trustees had the power to sell and convey the islands and submerged lands after notice. *Id*. at 230.  The deed describes the land to be conveyed as "parcels, tracts or shallow banks" and does not reference sovereign lands or navigable waters. (DE 134-6).

The authority given to the Trustees under the 1917 Act is narrowly circumscribed by the public trust doctrine and could not divest the public of ownership of navigable waters. *Coastal Petroleum Co. v. American Cyanamid Co.,* 492 So. 2d 339, 342 (Fla. 1986); *Deering*. "Sovereignty lands cannot be conveyed without clear intent and authority and conveyances, where authorized and intended, must retain public use of the waters." *Coastal Petroleum*, at 342 (citations omitted); *see also City of W. Palm Beach v. Bd. of Trs. of the Internal Improvement Fund,* 746 So. 2d 1085 (Fla. 1999) ("[A]ny divestiture of state sovereignty land must be limited by the fact that the State holds sovereign submerged lands in public trust for the benefit of all citizens of the State.")

Subsequently in 1921, for the purpose of encouraging the development of waterfront

property, the Florida Legislature enacted the Butler Act, Chapter 8537, Laws of Florida. Subject to the public trust doctrine and stating that it should not be construed to limit boating, bathing or fishing in the water covering submerged lands, it allowed riparian landowners to fill in and improve their lands so long as the bulkhead, fill or improvements did not interfere with navigability of the waterway.  *Id.* To obtain title, however, a riparian owner needed to build wharves or fill in the submerged lands and erect permanent buildings.  The Butler Act vested title to land created by the lawful filling of submerged land when the filling became "a fact accomplished."  *See*, *Board of Trustees v. Bankers Life & Casualty Co.,* 331 So. 2d 381 (Fla. 1stDCA 1976).

The Butler Act was found to be constitutional by the Florida Supreme Court, but with limitations.  *State ex. rel. Buford v. Tampa*, 88 Fla 196, 102 So. 336 (1924).  First the Court acknowledged that the right of navigation in navigable waters was completely within the domain of the federal government under the Commerce Clause.  *Id.*  Secondly, the Court confirmed that lands under navigable waters were held by the State for purposes of navigation and other public uses, subject to lawful government regulation.  *Id.* at 206.

However, with respect to waters that are tidal, but not navigable, the court stated "such waters and lands were held by the State for the use and benefit of the public for boating, fishing and swimming" but that the state could convey such lands to benefit commerce.  *Id.* at 209.

In 1957, the Butler Act was repealed because of concern for the rights of the public in submerged sovereignty lands.  Chapter 57-362, Laws of Fla.; *Bd. of Trs. v. Sand Key Assoc.*, 512 So. 2d 934, 938 (Fla. 1987).

Chapter 57-362, known as the Bulkhead Act, authorized local governments, subject to

approval of the TIITF to establish a bulkhead line beyond which further extension or filling "'shall be deemed an interference with the servitude in favor of commerce and navigation with which the navigable waters of the state are inalienably impressed.'" *Gios v. Fischer*, 146 So. 2d 361, 362 (Fla. 1962).   The Act also proscribed any extension of lands bordering on or being in navigable waters of the state except where owners who had purchased lands from the Trustees and "'who on June 11, 1957 have permits issued by the United States Corps of Engineers, and [approval] by the trustees of the internal improvement trust fund to fill said lands.'". *Id*. at n. 4. The Florida Supreme Court upheld the constitutionality of the Act: "[T]he limitations of the act as construed place it squarely in line with the decisions defining the nature of the state's title in sovereignty lands in general, and the restrictions inherent in its powers of alienation."  *Id*. at 363. The Court continued "in the absence of some overriding necessity a conveyance of public lands or rights in lands which actually results in the impairment of the public servitudes, referred to in the statute here involved, must fail. . . . no rights lawfully vesting under previous conveyances will be infringed by a proper application of this legislation . . . whether it is sustained as police regulation or an exercise of retained power under the trust doctrine governing sovereign lands…" *Id*.[4]

---

[4] The City also argues that because of the indefinite dimensions of his property, Mr. Lozman needs to quiet title as a prerequisite to a takings claim. (DE 135, p. 12-15).  Mr. Lozman responds that the boundary dispute issues goes to damages, that a federal takings claim is not an appropriate vehicle for collateral quiet-title litigation. (DE 143, p. 7-8).  Early in the case I denied a motion filed by the City to dismiss the complaint because of failure to join the Trustees of the Internal Improvement Fund as an indispensable party. (Motion, DE 12; Order DE 85).  Mr. Lozman argued that the Board was not indispensable: "They are free to go right on managing Florida's submerged wetlands and having their own opinions about the meaning of their century-old deed." (DE 23 at 12). I have come to understand, however, that the "meaning" of the "century-old deed" is significant, and I now question both the extent of Mr. Lozman's title to the lands underneath navigable and tidal waters and the authority of the TIITF to have conveyed it. *See*, *Pierce v. Warren*, 47 So. 2d. 857 (Fla 1950) *cert denied* 341 U.S. 914 (1951). The Parties have not briefed this issue, however, and I find it unnecessary to

It is apparent from the history and evolution of Florida law pertaining to submerged lands that Mr. Lozman has never had any right or reasonable expectation to develop those portions of his land.  In a case involving application of the public trust doctrine in Mississippi the Supreme Court rejected a takings claim and upheld the state's rights over submerged lands beneath tidal waters.  *See Phillips Petroleum Co. v. Miss.,* 484 U.S. 469 (1988).  The Court noted that states have interests beneath tidal waters that have nothing to do with navigation, for example fishing, swimming, and resource management. *Id*. at 476.  The Court rejected the submerged landowners' claims that they had reasonable expectations of ownership based upon their record title and the fact that they and their predecessor's in interest had paid taxes on the land. *Id*. at 482.  Noting that Mississippi courts had consistently affirmed the state's public interest in the lands, the court stated: "We have recognized the importance of honoring reasonable expectations in property interests." *Id*. "But such expectations can only be of consequence where they are 'reasonable' ones." *Id*.

### 3.  *The Comprehensive Plan Governs*

Undeterred by both federal and state obstacles to any ability to bulkhead, dredge, and fill the submerged portion of the land, Mr. Lozman claims a taking occurred when the City passed Ordinance 4147 in 2020.  As a matter of Florida Law this argument is also untenable.

As discussed above, in Florida the Comprehensive Plan, once adopted is paramount and non-discretionary.  Any inconsistent zoning ordinance cannot be relied upon.  Section 163.3194 "is framed as a rule, a command to cities and counties that they must comply with their own Comprehensive Plans after they have been approved by the State." *Pinecrest Lakes,*

reach it in view of settled background principles limiting the filling of submerged lands.

18

*Inc. v. Shidel*, *supra* at 198. *See also*, *Mojito Splash, LLC v. City of Holmes Beach,* 326 So. 3d. 137 (Fla. 2d DCA 2021).

In *Mojito*, the City adopted an amendment to its Comprehensive Plan limiting occupancy in vacation rentals to six persons.  Four years later, with constructive notice of the Plan, *Mojito* purchased a vacation rental capable of hosting 12 guests, began marketing the property, and generating significant weekly income. *Id*. at 138.

Subsequently, the City adopted ordinances amending the City's Land Development Code to conform with the Comprehensive Plan restating the occupancy limit and adding an enforcement mechanism. *Id*. *Mojito* sued the City under the Bert J. Harris, Jr. Private Property Rights Protection Act, Section 70.001-80, Florida Statutes, arguing that newly enacted ordinances inordinately burdened and restricted his property rights.[5] *Id*.

The claim was rejected on a basis which directly applies to Mr. Lozman, "Compliance with a comprehensive plan is mandatory." *Id*.  at 141.  From the start, *Mojito's* development was inconsistent with, and unauthorized by the City's Comprehensive Plan. *Mojito Splash, LLC v. City of Holmes Beach*, *supra* at 141.

Similarly here, and apart from federal and state background principles governing navigable waters and submerged lands, from December 19, 1991 forward, Mr. Lozman's property was designated by a Comprehensive Plan as a Special Preservation Area precluding

---

[5] The *Bert J. Harris Act* creates a cause of action where a law, regulation or ordinance, as applied, inordinately burdens, restricts, or limits use of property. *See* Fla. Stat. § 70.001.  The Act applies to governmental actions that may not rise to the level of a taking under the State Constitution or the United States Constitution. *Id*.  Although the Act uses the term "reasonable, investment-backed expectations" found in *Penn Cent. Transp. Co. v. City of N.Y.*, the Harris Act states that it may not necessarily be construed under the case law regarding takings if the governmental action does not rise to the level of a taking. *Id*. at (1), (9).  *See Ocean Concrete, Inc. v. Indian River Cty. Bd. of Cty. Comm'rs*, 241 So. 3d 181 (Fla. 4th DCA 2018).

use of submerged lands.  At no time since he purchased the property in 2014 has Mr. Lozman had any reasonable expectation or right to fill that portion of his land.  *See also*, *Palm Beach Polo, Inc. v. Vill. of Wellington*, 918 So. 2d 988 (Fla. 4th DCA 2006) (Finding Bert Harris Act claim frivolous and denying taking claim where plaintiff was never entitled to build on land designated as a natural preserve.)

### B. <u>Economic and Beneficial Use</u>

Mr. Lozman's *Lucas* claim suffers from yet another flaw.  Not only does the takings clause not require compensation when an owner is barred from putting land to a use that is proscribed by existing rules or understandings, but a *Lucas* taking also requires an owner to be denied all economically productive or beneficial uses of land beyond what the relevant background would dictate. 505 U.S. at 1029.[6]

The Supreme Court emphasized this aspect of *Lucas* in *Tahoe-Sierra Prs. Council v. Tahoe Reg'l Planning Agency*, 535 U.S. 302 (2002):

> The categorical rule that we applied in *Lucas* states that compensation is required when a regulation deprives an owner of "all economically beneficial uses of his land." *Id.* at 1019. Under that rule, a statute that "wholly eliminated the value" of Lucas' fee simple title clearly qualified as a taking.  But our holding was limited to "the extraordinary circumstance when *no* productive or economically beneficial use of land is permitted." *Id.* at 1017. The emphasis on the word "no" in the text of the opinion was, in effect, reiterated in a footnote explaining that the categorical rule would not apply if the diminution of value were 95% instead of 100%.  *Id* at 1019, n.8.  Anything less than a "complete elimination of value" or a "total loss," the Court acknowledged, would require the kind of analysis applied in *Penn Central*. *Lucas*, 505 U.S. at 1019-1020, n. 8.

---

[6]  In *Lucas*, the trial court found the two beachfront lots to have been rendered valueless and the Supreme Court declined to entertain argument that the finding was erroneous. 505 U.S.  at 1019; fn. 9.

Mr. Lozman continues to have what he has always had, a narrow strip of dry land, likely worth more than he paid.[7] The value of his property has not been wholly eliminated.

**C.   A *Penn Central*-Type Regulatory Taking is not Pled, Nor Would it be Ripe**

*S. Grande View Dev. Co. v. Alabaster*, *supra*, the other case upon which Mr. Lozman principally relies, is also not helpful to him. The developer in that case bought approximately 547 acres within the City for $1.65 million in 1994. The Master Plan for the development was approved by the City in 1995. *S. Grande View Dev. Co. v. Alabaster* at 1301.  Most of the development was finished by 2008, but a 142-acre portion was to be the last phase. *Id*.  Under the Master Plan, that portion was zoned R-4 (60-foot-wide garden homes), R-7 (townhomes) and a small part was R-2 (90-foot single family residences). *Id*.   Besides the purchase price of the entire parcel, the developer spent an additional $3,532,849.19 to develop that portion. *Id*. at 1304.  The recession hit, and the City received complaints from neighbors who worried that the developer would lose the land through foreclosure and another builder "would ruin the aesthetic value of the neighborhood." *Id*.  at 1307.  In response, in 2011, the City passed a specific ordinance that targeted only the remaining 142 acres, changing it entirely to R-2 lots. *Id*.

Besides the obvious difference in the nature and timing of the governmental action, *S. Grande View Dev. Co*. applies a different legal theory than that brought by Mr. Lozman.  Mr. Lozman claims a complete elimination of his property's value – a *Lucas* claim. The *S. Grande View Dec. Co.* is a regulatory-takings challenge governed by the standard set forth in *Penn*

---

[7] The City has filed an appraisal valuing Mr. Lozman's property at $130,000—over five times his purchase price. (DE 134-31).

*Central Transp. Co. v. New York City*, 458 U.S. 104 (1978). *See also*, *Lingle v. Chevron, U.S.A., Inc.*, 544 U.S. 528 (2005).

To be clear, Mr. Lozman expressly concedes that he is not proceeding on a *Penn Central*-type regulatory takings theory. The *Penn Central* factors primarily concern the economic impact of a regulation on the claimant and, particularly the extent to which the regulation interfered with distinct investment-backed expectations. *Penn Central*, *supra* at 539. In addition, whether the governmental action amounts to a physical invasion or merely affects property interests through "some public program adjusting the benefits and burdens of economic life to promote the common good" may be relevant in discerning whether a taking has occurred. *Id*. On the other hand, in the *Lucas* context, the complete elimination of a property's value is the determinative factor. *See*, *Lucas*, *supra* at 1017. *See also*, *Lingle v. Chevron*, *supra* at 539.

"A 'reasonable investment-backed expectation' must be more than a 'unilateral expectation or an abstract need.'" *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1005 (1984) (citation omitted) (finding that after Monsanto was on notice of the manner EPA was authorized to use its data there could be no reasonable, investment based expectation that EPA would keep its data confidential). If analyzed as a regulatory taking, a claim not made in his Complaint, Mr. Lozman's purchase of largely submerged land with notice that it fell within a Special Preservation Land Use designated area, can justify few if any legitimate investment-backed expectations. He most certainly had no reasonable expectation to bulkhead, dredge and fill his land for residential development.

At present, Mr. Lozman has applied for a permit from the Army Corp of Engineers to moor his floating home on his property—precisely what his complaint states his intent was

22

when he acquired the property. (DE 1 at ¶16).  Mr. Lozman has also supplemented the summary judgment record with permits which he claims indicate that the state and federal government "will allow a sizeable dock (big enough to accommodate floating homes, registered vessels, livable yacht- ArKup) over the water portion of the Lagoon which spans Plaintiff's property." (DE 193).  But he has yet to seek such a permit.

## IV.    CONCLUSION

In short, under both federal and state law, settled background principles deny Mr. Lozman any right to fill the submerged portion of his land. His *Lucas* claim fails. It remains uncertain whether he can build a dock or moor his floating home at the property. He has yet to apply for necessary permits.  A *Penn Central* regulatory taking claim has not been pled, and in any event would not be ripe.

For the foregoing reasons, it is hereby **ORDERED and ADJUDGED** that:

(1) Plaintiff's Motion for Partial Summary Judgment (DE 137) is **DENIED**.

(2) Defendant's Motion Summary Judgment (DE 135) is **GRANTED**.

(3) Judgment will be entered by separate order.

**SIGNED** in chambers at West Palm Beach, Florida this 3rd day of April, 2023.


Donald M. Middlebrooks
United States District Judge


cc:      counsel of record

# <u>Appendix A</u>

The images and text herein are excerpted from Docket Entry 134-31 at 12, 18.







Northern portion of the subject looking southwest from North Ocean Drive



Northern portion of the subject looking west from North Ocean Drive